# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---

JAMES AND CHRISTINE ZIOLKOWSKI, individually and on behalf of all others similarly situated,

          Plaintiffs,

     v.

ALIBABA GROUP HOLDING LIMITED, JACK YUN MA, JOSEPH C. TSAI, JONATHAN ZHAOXI LU, and MAGGIE WEI WU,

         Defendants.

Case No: _____

**CLASS ACTION COMPLAINT**

JURY TRIAL DEMANDED



---

Plaintiffs, by and through the undersigned attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge.  Plaintiffs' information and belief is based upon, among other things, counsel's investigation, which includes, without limitation: (1) a review and analysis of regulatory filings by Alibaba Group Holding Limited ("Alibaba" or the "Company") with the U.S. Securities and Exchange Commission ("SEC"); (2) a review and analysis of press releases and media reports issued by and about the Company; and (3) a review of other publicly available information concerning Alibaba.  Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION AND OVERVIEW

1.      This is a securities class action on behalf of all purchasers of Alibaba American Depository Shares ("ADS") between October 21, 2014 and January 28, 2015, inclusive (the "Class Period"), asserting claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.      Defendant Alibaba is a China-based online and mobile commerce company with retail and wholesale trading operations, as well as cloud computing and other services.  Alibaba claimed that it was "the largest online and mobile commerce company in the world in terms of gross merchandise volume" in 2013.  The Company operates as an online sales platform for third parties and does not engage in direct sales, compete with merchants, or hold inventory.

3.      Throughout the Class Period, Defendants issued materially false and/or misleading statements regarding the Company's business operations and the strength of its financial prospects, while concealing significant ongoing regulatory scrutiny concerning its core business.

1

4.     Specifically, Defendants failed to disclose that Company executives had met with China's State Administration of Industry and Commerce ("SAIC"), China's main corporate regulator, in July 2014 – just two months before Alibaba's $25+ billion initial public offering in the United States (the "IPO") – and that regulators at the meeting had brought to Defendants' attention a variety of highly questionable – even illegal – business practices that the SAIC told Alibaba it was then actively targeting and which threatened the core of Alibaba's business, including:

- alleged sale of counterfeit goods, including fake cigarettes, alcohol, and branded handbags, by vendors on Alibaba's third-party marketplace platform;

- alleged sale of restricted weapons and other forbidden items on Alibaba's third-party platform;

- alleged bribe-taking by Alibaba employees from merchants and others seeking to help boost their search rankings and get advertising space;

- willful ignorance by Alibaba of the practice by some vendors of faking transactions to make their sales volumes appear higher;

- the lack of effort by the Company to prevent merchants from using tactics such as false and misleading advertising; and

- alleged anticompetitive behavior such as forbidding merchants to participate in rival sites' promotions.

5.     Prior to the disclosure of the SAIC investigation detailed above, Alibaba and certain "selling shareholders" sold more than 368 million ADS in the IPO at $68 each, raising more than $25 billion.  Selling shareholders included two of Alibaba's co-founders, Executive Chairman of the Board Jack Yun Ma ("Ma"), who sold at least 12.75 million shares, and Vice

Chairman of the Board Joseph C. Tsai ("Tsai"), who sold at least 4.25 million shares. Throughout the Class Period, Alibaba's ADS continued trading at ever-increasing, artificially inflated prices, reaching a Class Period high of approximately $119.15 on November 10, 2014.

6.      On January 28, 2015, before the opening of trading, various members of the financial media reported that the SAIC had released a white paper accusing Alibaba of engaging in the same illegal conduct that was disclosed to Alibaba executives in July 2014 but not to the public.

7.      On this news, the price of Alibaba ADS dropped 4%, or $4.49 per ADS, closing at $98.45 per ADS on January 28, 2015, on unusually high volume of approximately 42 million shares traded.

8.      The following day, on January 29, 2015, before the market opened, Alibaba issued a press release announcing its financial results for the fourth quarter 2014 ("4Q 2014") ended December 31, 2014.  The Company reported revenues of just $4.22 billion for 4Q 2014, significantly missing the $4.45 billion target Defendants had previously represented to the investment community that they expected.  The Company also disclosed that its net income had fallen to $964 million, a 28% decline from the financial results for the fourth quarter 2013 ("4Q 2013") and that earnings per share had decreased to $0.37 per share, a 35% decrease from 4Q 2013.

9.      Alibaba largely attributed the decline to expenses from giving shares to employees.  The Company also blamed challenges in generating revenue from transactions on its mobile platforms, where advertising is less profitable and sales are monetized at a lower rate than on personal computers.  The mobile purchases compromised a larger percentage of sales than personal computers in the quarter than in the previous quarter.

3

10.     On January 29, 2015, as a result of these disclosures, the price of Alibaba ADS plunged $8.64 to close at $89.81 per ADS, declining approximately 9% from the previous day, again on extremely unusually high volume of more than 76.6 million shares trading.  The two declines collectively reduced the price of Alibaba ADS more than 25% from their Class Period high, erasing more than $11 billion in market capitalization.

## JURISDICTION AND VENUE

11.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

12.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and Section 27(c) of the Exchange Act (15 U.S.C. §78aa(c)).  Alibaba's agent for service of process is located at 1180 Avenue of the Americas, Suite 210, New York, New York 10036, which is in this District.  Alibaba's ADS were offered and trade on the New York Stock Exchange ("NYSE"), located in this District.  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

13.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

14.     Plaintiffs James and Christine Ziolkowski as set forth in the accompanying certification, incorporated by reference herein, purchased Alibaba ADS during the Class Period

and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

15.     Defendant Alibaba is headquartered in Hangzhou, China and incorporated in the Cayman Islands.  Its ADS are traded on the NYSE under the ticker symbol "BABA."

16.     Defendant Ma, the lead founder of Alibaba, is, and at all relevant times during the Class Period was, the Company's Executive Chairman of the Board of Alibaba.

17.     Defendant Tsai, co-founder of Alibaba, is, and at all relevant times during the Class Period was, Executive Vice Chairman of the Board of Alibaba.

18.     Defendant Jonathan Zhaoxi Lu ("Lu") is, and at all relevant times during the Class Period was, Chief Executive Officer ("CEO") and a director of Alibaba.

19.     Defendant Maggie Wei Wu ("Wu") is, and at all relevant times during the Class Period was, the Company's Chief Financial Officer ("CFO").

20.     Defendants Alibaba, Ma, Tsai, Lu, and Wu are collectively referred to herein as the "Defendants."

21.     Defendants Ma, Tsai, Lu, and Wu are collectively referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

22.     Alibaba is a China-based online and mobile commerce company.  The Company provides technology and services to enable consumers, merchants, and other participants to conduct commerce in what it terms its "ecosystem."  Alibaba operates Taobao Marketplace, an online shopping site; Tmall, a third-party platform for brands and retailers; and Juhuasuan, a group shopping site.  The Company claims to provide the fundamental technology infrastructure

and marketing reach to help businesses leverage the ability of the Internet to establish an online presence and conduct commerce with consumers and businesses.

23.    In July 2014, two months before its IPO, Alibaba executives met with the SAIC. During this meeting the regulators brought to Alibaba's attention a variety of highly suspect – even illegal – business practices that the SAIC advised Alibaba it was then actively targeting and which threatened the core of Alibaba's business, including:

- the widespread sale of counterfeit goods, including fake cigarettes, alcohol, and branded handbags, by vendors on Alibaba's third-party marketplace platform;

- the sale of restricted weapons and other forbidden items on Alibaba's third-party platform;

- bribe-taking by Alibaba employees from merchants and others seeking to help boost their search rankings and get advertising space;

- willful ignorance by Alibaba of the practice by some vendors of faking transactions to make their sales volumes appear higher;

- the lack of effort by Company officials to stop merchants from using tactics such as false and misleading advertising; and

- alleged anticompetitive behavior such as forbidding merchants to participate in rival sites' promotions.

**Defendants' Materially False and Misleading Statements Before the Class Period and Class Period Misstatements**

24.    On May 6, 2014, Alibaba filed with the SEC a Registration Statement on Form F-1, which would later be utilized for the IPO following several amendments in response to comments by the SEC.  Each of the Individual Defendants signed the Registration Statement. The SEC declared the Registration Statement effective on September 18, 2014.  On or about

6

September 19, 2014, Alibaba priced the IPO at $68 per ADS and filed the final Prospectus for the IPO on September 22, 2014, which forms part of the Registration Statement (collectively, the "Registration Statement").

25.     Concerning the purported integrity of Alibaba's third-party marketplace portal, or its "growing ecosystem," and the legitimacy of the products being sold there, the Registration Statement stated in pertinent part as follows:

> ***We have been a leader in developing online marketplace standards in China***. Given the scale we have been able to achieve, an ecosystem has developed around our platform that consists of buyers, sellers, third-party service providers, strategic alliance partners, and investee companies.  Our platform and the role we play in connecting buyers and sellers and making it possible for them to do business anytime and anywhere is at the nexus of this ecosystem.  ***Much of our effort, our time and our energy is spent on initiatives that are for the greater good of the ecosystem and the various participants in it***.  We feel a strong responsibility for the continued development of the ecosystem and we take ownership for this development.  Accordingly, we refer to this as "our ecosystem."
>
> ***Our ecosystem has strong self-reinforcing network effects that benefit our marketplace participants, who are invested in our ecosystem's growth and success.  Through this ecosystem, we have transformed how commerce is conducted in China and built a reputation as a trusted partner for the participants in our ecosystem***.

(Emphasis added.)

26.     Emphasizing the Company's purportedly "***Trusted Brands***," the Registration Statement highlighted as a "strength" that "Alibaba, Taobao, Tmall [were] well recognized and trusted brands in China," and that "[d]ue to the strength of these brands, a majority of [its] customers navigate[d] directly to [its] China retail marketplaces to find the products and services they [were] seeking instead of via third-party search engines."

27.     The Registration Statement also emphasized the Company's "***Thriving Ecosystem with Powerful Network Effects***," stating that it was "the steward of a thriving ecosystem, which

provide[d] [it] with [certain] key advantages," including that "*interactions among participants create[d] value for one another as [its] ecosystem expand[ed] and generate[d] strong network effects*." (Emphasis added.)

28.   The September 19, 2014 Registration Statement further emphasized the Company's "Data Insights" and "Third-party Platform Business Model" as competitive strengths, stating in pertinent part as follows:

> ***Data Insights.***   Data from consumer behavior and transactions completed on our marketplaces and interactions among participants in our ecosystem ***provide us with valuable insights to help us and our sellers improve the buyer experience***, operate more efficiently and create innovative products and services.
>
> ***Third-party Platform Business Model***.   Our exclusively third-party platform business model allows us to scale rapidly ***without the risks and capital requirements of sourcing, merchandising and holding inventory borne by direct sales companies***.   This business model ***drives our profitability and strong cash flow***, which give us the flexibility to further invest in and improve our platform, expand our ecosystem and aggressively invest in people, technology, innovative products and strategically important assets.

(Emphasis added.)

29.   The Company's final Registration Statement, dated September 19, 2014, stated, in pertinent part, as follows:

> Due to promotional events and higher consumer spending in the quarters ended June 30 and December 31, merchants are inclined to allocate more of their marketing spending during these periods to compete for and attract this consumer spending, ***which therefore drives revenue growth during those periods*** disproportionately to GMV growth and because ***increased demand for such services also increases pricing***.

(Emphasis added.)

30.   Item 303 of Regulation S-K (17 C.F.R. §229.303) and the SEC's related interpretive releases thereto require issuers like Alibaba to disclose events or uncertainties, including any known trends, that have or are reasonably likely to cause the registrant's financial information not to be indicative of future operating results.  Plaintiffs allege that Alibaba failed

8

to disclose that the Company and the SAIC had met and the Company was advised that the SAIC accused the Company of engaging in numerous suspect – if not illegal – business practices. Plaintiffs allege that the SAIC investigation and the allegations against the Company should have been disclosed in the Registration Statement.

31.     Defendant Ma made certain statements during the time period surrounding the IPO stating that Alibaba would not undertake any untoward business practices to increase sales at the expense of the Company's reputation, including the following:

a.     On September 19, 2014, Ma told CNBC that he had "always believe[d] that [the] customer [is] number one, employee[s are] number two and shareholder[s are] number three."

b.     On September 22, 2014 Ma told *The Independent* that he would never take action to drive up stock prices to the detriment of customers, stating, "[f]or me, the price, up and down, my people worry about that. I want to make the customer happy."

c.     Defendant Ma stated in an attachment to the September 19, 2014 Registration Statement: "I have said on numerous occasions that we will put 'customers first, employees second, and shareholders third.' I can see that investors who hear this for the first time may find it a bit hard to understand. Let me be clear: as fiduciaries of the company, we believe that the only way for Alibaba to create long-term value for shareholders is to create sustainable value for customers. So customers must come first."

d.     On September 28, 2014, in an interview on *60 Minutes,* Ma proclaimed, "If you want to invest in us, we believe customer number one, employee

9

number two, shareholder number three.  If they don't want to buy that,

that's fine.  If they regret, they can sell us."

32.     On November 4, 2014, before the market opened, Alibaba issued a press release

announcing its financial results for the 3Q 2014 ended September 30, 2014.  The Company

reported net income of $494 million, or $0.20 per share, on revenues of $2.7 billion.  Concerning

the strength of the Company's ongoing business, the press release stated, in pertinent part:

> "We delivered a strong quarter with significant growth across our key operating metrics," said Jonathan Lu, chief executive officer of Alibaba Group.  "***Our business continues to perform well, and our results reflect both the strength of our ecosystem and the strong foundation we have for sustainable growth***. On our China retail marketplaces, gross merchandise volume for the quarter increased 49% and annual active buyers increased 52% year on year.  We extended our unrivaled leadership in mobile with 217 million monthly active users on our mobile commerce apps in September and US$95 billion in mobile GMV for the twelve months ended September 2014.  ***We are also encouraged by continued improvement of mobile monetization which demonstrates the strong commercial intent of our users***."

> "Our financial performance this quarter was robust, with revenue growing 54% year on year," said Maggie Wei Wu, chief financial officer of Alibaba Group.  ***We continue to execute our focused growth strategy, and the fundamental strength of our business gives us the confidence to invest in new initiatives to add new users, improving engagement and customer experience, expand our products and services and drive long-term shareholder value***."

(Emphasis added.)

33.     Later that day, Defendants Tsai, Lu, and Wu conducted a call with investors to

discuss the quarterly financial results, making additional positive statements about the strength of

the Company's ongoing business metrics and financial prospects.

34.     On November 10, 2014, the Company issued a press release entitled "Alibaba

Group Generated US$2 Billion in GMV in First Hour of 11.11 Shopping Festival," highlighting

that the sales had greatly exceeded expectations in the annual event.

35.     On November 11, 2014, Defendant Ma was also interviewed by CNBC's David Faber on "Squawk on the Street."  Concerning the importance of the Company's good reputation and not seeking to push sales as a way to increase the stock price at the cost of damaging its reputation, Defendant Ma emphasized that Alibaba always put its customers' best interests before the stock market's perception of Alibaba's profitability and worth, stating in pertinent part as follows:

> JACK MA: – YOU KEEP – YOU TRY TO KEEP THE PEOPLE YOU TRUST, AND THEY TRUST IN YOU, HAPPY.  'CAUSE I CANNOT MAKE EVERY SHAREHOLDER HAPPY.  ***THE SHAREHOLDER HAS TO UNDERSTAND THIS COMPANY HAVE A STRANGE UNIQUE PHILOSOPHY.  WE ARE BUILDING ON A BUSINESS MODEL THAT'S A ECOSYSTEM***.  NOBODY EVER HEARD OF THAT.  ***WE'RE FOCUSING ON HELPING CUSTOMERS, SMALL BUSINESS***.  WE'RE FOCUSING ON MAKING SURE THAT EMPLOYEE HAPPIES AND THEN THE SHAREHOLDER.
>
> DAVID FABER: AND SO – IF I HAVE TO ASK YOU TO DESCRIBE THE CULTURE OF ALIBABA, WHAT IS IT?  IS IT THAT?
>
> JACK MA: ***TRUST AND TRANSPARENT***.  'CAUSE WE ARE WORKING WITH – MY COMPANY AND THE TEAM HAVE – WE HAVE 30 THOUSAND SMART PEOPLE.  ***IF YOU WORK WITH THE SMART PEOPLE, YOU GOTTA BE TRANSPARENT.  YOU GOTTA MAKING SURE THEY TRUST YOU AND YOU TRUST THEM AND MAKING SURE THAT EVERYBODY HAVE THE SAME VISION – AND VISION AND VALUE. AND THESE ARE THE CORE***.  'CAUSE THEY'RE SO SMART.  IT SI SOMETIMES GREAT TO WORK WITH THE STUPID GUYS, WHATEVER YOU SAY, THEY'LL FOLLOW IT.  BUT IT'S A GOOD PAIN IF THEY – IF YOU ARE SMART THAN THEM – IT IS A DISASTER.

(Emphasis added.)

36.     The same day, November 11, 2014, the Company issued a release entitled "Alibaba Group Generated US$9.3 Billion in GMV on 11.11 Shopping Festival – Mobile GMV Accounted for 42.6%."  This release further emphasized the purportedly strong quarter the Company was then having, stating, in pertinent part, as follows:

"On behalf of our entire ecosystem – from millions of buyers and merchants both here and abroad – we are very happy with the results of this year's 11.11 shopping festival," said Jonathan Lu, CEO of Alibaba Group.  *We are particularly encouraged by the growing trend of consumers embracing mobile shopping on a global stage*.  Alibaba is humbled to play a role in making it easy for people to do business anywhere."

The 11.11 Shopping Festival ("11.11") began in 2009 with 27 merchant participants as an event for Tmall.com merchants and consumers to raise awareness of the value in online shopping.  *This year, more than 27,000 brands and merchants participated in the event, including Costco, Muji, Desigual, ASOS, and The North Face.  By expanding globally with the participation of AliExpress and Tmall Global, consumers from over 217 countries and regions were able to select from more than one million products through online storefronts and e-commerce websites*.

(Emphasis added.)

37.     On November 13, 2014, the Company issued a press release stating that it was planning to offer Senior Unsecured Notes (the "Notes").  On November 21, 2014, the Company announced the following pricing of the Notes which would be sold to the U.S. investing public in an offering exempt from registration under the federal securities laws for a total of $8 billion:

- US$300 million floating rate notes due 2017 at an issue price per note of 100.000%;

- US$1,000 million 1.625% notes due 2017 at an issue price per note of 99.889%;

- US$2,250 million 2.500% notes due 2019 at an issue price per note of 99.618%;

- US$1,500 million 3.125% notes due 2021 at an issue price per note of 99.558%;

- US$2,250 million 3.600% notes due 2024 at an issue price per note of 99.817%; and

- US$700 million 4.500% notes due 2034 at an issue price per note of 99.439%.

38.     The Notes were priced favorably to Alibaba based on its then present strong corporate debt ratings.

12

39.     On December 7, 2014, the Company issued a press release entitled "Alipay 2014 Spending Report Sheds Light on Chinese Online Spending Behavior."  Alipay was launched in December 2004 as part of the Alibaba Group's "ecosystem" and provides the Company's online payment services.  The release stated, in pertinent part, as follows:

> Alipay, China's largest online payment service provider, marks its 10-year anniversary today with the release of its Annual Spending Report, highlighting the development of online economic activity and consumer behavior of Chinese Internet users over the past decade (2004 through October 31, 2014). *According to the report, the availability of online-payment services has played a major role in making goods and services widely accessible throughout Chinese society, especially in less-developed interior provinces and counties where people now enjoy equal access to branded products at the same prices as those living in first- and second-tier cities*.
>
> ***
>
> Meanwhile, with ongoing advances in mobile Internet technology, e-commerce in China continues to shift from desktop PCs to smartphones and other mobile devices.  From 2012 to 2014, the proportion of mobile payments to total payments in some of the country's less-developed regions more than doubled, *indicating consumers in rural areas and smaller cities are quickly adopting mobile devices as their primary tool for online shopping as more people in China have access to mobile devices and smartphones*.

(Emphasis added.)

40.     On December 23, 2014, the Company issued a press release entitled "2014 Counterfeit Report Press Conference – Speech By Jonathan Lu, CEO of Alibaba Group."  The release purported that Alibaba was actively monitoring and deterring counterfeit sales on its platform and other fraudulent activity, stating, in pertinent part, as follows:

> Ever since the founding of Alibaba Group in 1999, it has been our mission to make it easy to do business anywhere.  *This ease of doing business must be facilitated by trust.  We believe that trust is the basis for wealth and that trust is an important currency that makes our e-commerce platforms tick.  All the work that we have done over the past 15 years underscores this belief*.
>
> *Since the establishment of Taobao in 2003, Alibaba Group has constantly fought to protect the interests of consumers in the Internet space and together*

13

*with our valued government partners, we have made great strides in addressing this issue*.

However counterfeiting is a global problem and one that we need to face together as a society.  From Alibaba Group's perspective, we bear a serious responsibility in this fight against counterfeits. Jack Ma said yesterday – if e-commerce does well in China, that may have little to do with Alibaba Group, but if counterfeits in society are not tackled effectively, it has a lot to do with Alibaba Group.

*In our years of combating this problem, we have built cooperative relationships with various government bodies to combat counterfeiting at its source in order to safeguard the interests of consumers.  We have built systems and services like Alipay that are based on trust and are there to protect the consumer because in the end, counterfeiting hurts Alibaba Group as consumers who receive fake goods may no longer want to shop on our platforms*.

*Thankfully, Internet technology has made it easier for transactions to be traced. This means that by analyzing transaction data we can trace counterfeiters who sell online.  Through the analysis of big data, online sources of counterfeit products can be tracked offline, making it easier to enforcement authorities to do their work*.

Secondly, we believe that protecting customer rights and combating counterfeits should be a long-term and persistent goal.  To achieve that, support needs to come from all levels of society.  *Through the years, Alibaba Group has become more effective at protecting consumer rights and combating counterfeits.  According to the latest data available, only 3.5 transactions in every 10,000 transactions received customer complaints, 22% decline from last year*.

Effectively combating the counterfeiting issue requires the active involvement from different government agencies and authorities, as the root of the counterfeit problem is offline.  *By collaborating with China's Public Security Bureau, the General Administration of Quality Supervision, China's State Intellectual Property Office and State Administration of Press, Publication, Radio, Film and Television and leveraging new tools such as the Internet and big data, Alibaba hopes that these measures will be impactful in combating fakes in the real world.  We hope that by exposing counterfeiters and supporting the fight in a long-term fashion, fakes can be eliminated one day*.

(Emphasis added.)

41.    On January 8, 2015, the Company issued a press release entitled "Alibaba and Microsoft Collaborate To Improve Online Customer Experience, Creating a Safer Internet."  The

release again claimed Alibaba was actively monitoring and deterring counterfeit sales on its platform and other fraudulent activity, stating in pertinent part as follows:

> "*Alibaba Group takes the issue of IPR infringement very seriously and we are constantly working with partners and stakeholders to enhance IPR protection on our platforms in order to tackle the problem of counterfeiting effectively," said Ni Liang, Alibaba Group's Senior Director of Security Operations*.

(Emphasis added.)

42.    The true facts, which were known by the Defendants throughout the Class Period, but were not disclosed to the investing public, were as follows:

a.    the Company was engaged in a multitude of suspect – if not illegal – business practices;

b.    Chinese regulators had brought the Company's improper business practices to its attention in July 2014 as part of their efforts to increase enforcement of consumer protection laws in China, exposing the Company to fines, penalties, and damage to its reputation; and

c.    Alibaba's 4Q 2014 net income was declining as a result of its unscrupulous business practices.

### THE FOG BEGINS TO LIFT AND THE TRUTH IS REVEALED

43.    On January 28, 2015, before the opening of trading, various members of the financial media reported that the SAIC had released a white paper accusing Alibaba of engaging in the same illegal conduct disclosed to Alibaba executives in July 2014.  Specifically, it was disclosed that at that time, two months prior to the IPO, regulators from the SAIC met with Defendants and brought to Alibaba's attention a variety of highly suspect – even illegal – business practices that the SAIC warned it was actively pursuing and which threatened the core of Alibaba's business.  Some of the relevant practices were the proliferation of the sale of

15

counterfeit goods, the selling of forbidden or restricted items, the taking of bribes from merchants by Alibaba employees, the knowing failure to act on vendors on its sites creating fake transactions and false advertising, and anticompetitive behavior by Alibaba, including prohibiting merchants from utilizing competitors' sites to sell their products.

44.     Carlos Tejada, a reporter from the *Wall Street Journal* who had reviewed the SAIC white paper before it was removed from the SAIC's website, wrote an article on January 28, 2015 entitled "China Raps Alibaba for Fakes."  The article states in relevant part:

> The Chinese government accused e-commerce giant Alibaba of failing to crack down on the sale of fake goods, bribery and other illegal activity on its sites in a rare public dispute with one of the country's most prominent companies.
>
> * * *
>
> Alibaba has long grappled with allegations that Taobao, its biggest ecommerce platform, is rife with counterfeit goods.  ***The accusations from the Chinese government could lend further force to those complaints and damage Alibaba's reputation among investors and brands overseas, while the highly public spat could hurt the company's relationship with the government, experts warn***.
>
> The government's accusations are in a white paper made public on Wednesday by China's State Administration for Industry and Commerce, ***but based on conversations between the agency and Alibaba officials in July.***  That was two months before Alibaba's U.S. IPO, which valued the Chinese company at more than $230 billion.  ***In the paper, the agency said it held off on disclosing details of the talk so as not to affect the IPO***.
>
> * * *
>
> ***The report said the problems had grown to become Alibaba's "greatest credibility crisis" since the company was established.  Citing a Chinese phrase that refers to letting a small problem fester, the paper said, "for a long time, [Alibaba] didn't pay sufficient attention to the issue and didn't adopt effective measures, causing a neglected carbuncle to become the bane of its life***."

(Emphasis added.)

16

45.     On this news, the price of Alibaba ADS dropped 4%, or $4.49 per ADS, closing at $98.45 on January 28, 2015 on unusually high volume of approximately 42 million shares trading.

46.     Then, on January 29, 2015, before the market opened, Alibaba issued a press release announcing its financial results for the fourth quarter 2014 ended December 31, 2014. The Company reported revenues of just $4.22 billion for the 4Q 2014, significantly missing the $4.45 billion target Defendants had led the investment community to expect based on Alibaba's ardent statements throughout the Class Period concerning its ongoing strong revenue growth. The Company also disclosed that its net income had fallen to $964 million, a 28% decline from 4Q 2013, and that earnings per share had decreased to $0.37 per share, a 35% decrease from 4Q 2013, a decline Alibaba largely attributed to expenses from giving shares to employees.  The Company also blamed challenges generating revenue from transactions on its mobile platforms, where advertising is less profitable and sales are monetized at a lower rate than on personal computers.  The mobile purchases compromised a larger percentage of sales than personal computers in the quarter than in the previous quarter.

47.     As a result of these disclosures, the price of Alibaba ADS plummeted another $8.64 per ADS to close at $89.81 per ADS on January 29, 2015, a one-day decline of approximately 9%, again on unusually high volume of more than 76.3 million shares trading. The two declines collectively reduced the price of Alibaba's ADS more than 25% from its Class Period high, erasing more than $11 billion in market capitalization.

## CLASS ACTION ALLEGATIONS

48.     Plaintiffs brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased or

otherwise acquired Alibaba ADS during the Class Period (the "Class") and were damaged thereby.  Excluded from the Class are Defendants, the directors and officers of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

49.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Alibaba securities were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Alibaba or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

50.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

51.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

52.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)      whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and management of Alibaba;

(c)      whether the price of Alibaba ADS were artificially inflated during the Class Period; and

(d)      to what extent the members of the Class have sustained damages and the proper measure of damages.

53.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## LOSS CAUSATION

54.      Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

55.      During the Class Period, Plaintiffs and the Class purchased Alibaba securities at artificially inflated prices and were damaged thereby.  When the misrepresentations that had been made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, the price of the Company's securities significantly declined, causing investors' losses.

## APPLICATION OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

56.     The market for Alibaba securities was open, well developed, and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Alibaba securities traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities, relying upon the integrity of the market price of Alibaba securities and the market information relating to Alibaba, and have been damaged thereby.

57.     During the Class Period, the artificial inflation of Alibaba stock was caused by the material misrepresentations and/or omissions particularized in this Complaint, causing the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Alibaba's business, operations, and financial prospects. These material misstatements and/or omissions created an unrealistically positive assessment of Alibaba and its business and financial condition, thus causing the price of the Company's securities to be artificially inflated at all relevant times and, when disclosed, negatively affected the value of the Company stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

58.     At all relevant times, the market for Alibaba securities was an efficient market for the following reasons, among others:

(a)     Alibaba stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

20

(b)     As a regulated issuer, Alibaba filed periodic public reports with the SEC and/or the NYSE;

(c)     Alibaba regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)     Alibaba was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

59.     As a result of the foregoing, the market for Alibaba securities promptly digested current information regarding Alibaba from all publicly available sources and reflected such information in Alibaba's ADS price. Under these circumstances, all purchasers of Alibaba securities during the Class Period suffered similar injury through their purchase of Alibaba securities at artificially inflated prices, and a presumption of reliance applies.

## NO SAFE HARBOR

60.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that

could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge, or was reckless in not knowing, that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Alibaba who knew, or was reckless in not knowing, that the statement was false when made.

## COUNT I

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder
### Against All Defendants

61.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

62.     During the Class Period, the Individual Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Alibaba securities at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, the Individual Defendants, and each of them, took the actions set forth herein.

63.     The Individual Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Alibaba securities in

violation of Section 10(b) of the Exchange Act and Rule 10b-5. The Individual Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

64.     The Individual Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Alibaba's business, operations, and financial performance and prospects, as specified herein.

65.     The Individual Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Alibaba's value, performance, and continued substantial growth.  These acts included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Alibaba and its business operations and financial prospects, in light of the circumstances under which they were made, not misleading.  As set forth more particularly herein, Defendants further engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.  Individual Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Individual Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Alibaba's financial condition from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Individual Defendants'

misstatements and/or omissions concerning the Company's business, operations, financial well-being, and prospects throughout the Class Period, Individual Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

66.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Alibaba securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by the Individual Defendants, or upon the integrity of the market in which the securities trade, and/or in the absence of material adverse information that was known to or recklessly disregarded by the Individual Defendants, but not disclosed in public statements by the Individual Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Alibaba securities during the Class Period at artificially high prices and were damaged thereby.

67.     At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding Alibaba and its business and prospects, which were not disclosed by Individual Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Alibaba securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

68.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

69.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT II

**Violation of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

70.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

71.     The Individual Defendants acted as controlling persons of Alibaba within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, ownership, and contractual rights, participation in and/or awareness of the Company's operations, and/or intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

72.     In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to

25

control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

73.     As set forth above, Alibaba and the Individual Defendants violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

A.     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure with Plaintiffs serving as class representatives;

B.     Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: February 25, 2015                    Respectfully submitted,

26

Joseph P. Guglielmo
Donald Broggi
SCOTT+SCOTT, Attorneys at Law, LLP
The Chrysler Building
405 Lexington Avenue, 40th Floor
New York, New York 10174
Tel: (212) 223-6444
Fax: (212) 223-6334
jguglielmo@scott-scott.com
dbroggi@scott-scott.com

David R. Scott
SCOTT+SCOTT, Attorneys at Law, LLP
156 South Main Street
Colchester, CT 06415
Tel: 860-537-5537
Fax: 860-537-4432
david.scott@scott-scott.com

## PLAINTIFF CERTIFICATION
## PURSUANT TO FEDERAL SECURITIES LAWS

<u>James Ziolkowski</u> ("Plaintiff"), declares, as to the claims asserted under the federal securities laws, that:

1. Plaintiff has reviewed the complaint and authorizes Scott + Scott Attorneys Law, LLP, and such co-counsel with whom it deems appropriate to associate, to pursue this action on a contingent-fee basis.

2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4. Plaintiffs transaction(s) in the **Alibaba Group Holding Limited** security that is the subject of this action during the Class Period is/are as follows:

| Date | Buy/Sell | No. of | Price Per Share |
|------|----------|--------|-----------------|
| 12/16/2014 | buy | 46.7303 | $107.00 |
| 12/2/2014 | buy | 46.3241 | $107.96 |
| 11/25/2014 | buy | 43.8264 | $114.09 |
| 11/18/2014 | buy | 89.309 | $111.96 |

5. During the three years prior to the date of this Certification, Plaintiff has never served, nor sought to serve, as a class representative in a federal securities fraud case unless such case is otherwise identified below.

6. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this _16_ day of February, 2015 at Buffalo, NY.

Your Printed Name: James Ziolkowski
Signature:
Mailing Address: 57 Barnard St.
Buffalo, NY 14206
Telephone Number: 716-548-3230
E-mail Address: zlkws@yahoo.com