UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHRISTINE ASIA CO., LTD., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>JACK YUN MA, et al.,<br><br>Defendants. | No.: 1:15-md-02631 (CM) (SDA)<br><br>Related cases:<br>1:15-cv-00759-CM<br>1:15-cv-00811-CM<br>1:15-cv-00991-CM<br>1:15-cv-01405-CM<br>1:15-cv-05020-CM<br>1:15-cv-04991-CM<br>1:15-cv-05002-CM |

## DECISION AND ORDER APPROVING SETTLEMENT

McMahon, J.:

Class Representatives William Tai and Christine Asia Co., Ltd., Abel Amoros, Arthur Gabriel, Raymond Lee, and Gang Liu (collectively, "Plaintiffs"), on behalf of themselves and the certified Class, have moved for approval of a settlement between the class and Defendant Alibaba. For the reasons set forth below, the settlement is APPROVED.

Class counsel seeks attorneys' fees of 25% of the Settlement Fund. Lead Counsel also seeks reimbursement of $3,937,803.35 of out-of-pocket expenses advanced by counsel, as well as $12,500 for each of the five representative Plaintiffs, as authorized by the Private Securities Litigation Reform Act of 1995 (the "PSLRA"). Those amounts are APPROVED.

## LITIGATION HISTORY

### The Instant Action and Appointment of Lead Plaintiffs and Lead Counsel

In early 2015, seven putative class action complaints were filed against Defendants in United States District Courts in New York and California. The first case was filed on January 30,

2015, in the Southern District of New York, styled *Khunt v. Alibaba Group Holding Limited et al.* (1:15-cv-00759-CM).

On May 1, 2015, the Court entered an order consolidating the seven actions filed in the Southern District of New York, appointing William Tai and Christine Asia Co., Ltd., as Lead Plaintiffs pursuant to the Private Securities Litigation Reform Act of 1995, and appointing the Rosen Firm as Lead Counsel for the putative class.

On June 9, 2015, the Judicial Panel on Multidistrict Litigation centralized all of the related actions in the United States District Court for the Southern District of New York, the centralized actions bearing the docket number 1:15-md-02631-CM.

**The Pre-Filing Investigation and Preparation of the Complaint**

Lead Counsel conducted a pre-filing investigation of Alibaba, which included, among other things: (1) reviewing and analyzing Alibaba's public SEC filings, IPO road show materials, press releases, earnings calls, various technology conference presentations, and other public statements made by Defendants prior to, during and after the class period; (2) researching, reviewing and analyzing other publicly available documents, reports, announcements, and news articles concerning Alibaba and/or the regulation of counterfeit goods in the People's Republic of China ("PRC"), and research reports prepared by the securities and financial analysis regarding Alibaba; (3) working with a finance expert to analyze Alibaba securities price movements to inform market efficiency, loss causation, and damages; (4) retaining and working with China-based private investigators who conducted interviews with former employees and other third parties in China; (5) reviewing and analyzing court filings and other publicly available material related to lawsuits filed against Alibaba for violations of intellectual property rights, including

but not limited to, *Gucci America Inc. et al. v. Alibaba Group Holding Ltd. et al.*, No. 1:15-cv-03784-PKC (S.D.N.Y. May 15, 2015); and (6) consulting with experts in PRC laws and regulations.

On June 30, 2015, Plaintiffs[1] filed and served the Complaint, together with approximately 100 pages of exhibits, asserting claims under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder. (Dkt. Nos. 4, 6) Among other things, the Complaint alleged that Alibaba and the Individual Defendants violated the Exchange Act by failing to disclose the existence, content, and significance of a July 2014 Meeting between China's State Administration of Industry and Commerce (the "SAIC") and Alibaba, and misrepresenting the true state of Alibaba's business, and operations, and the risks Alibaba was facing at the time of its September 2014 IPO and during the Class Period. The Complaint further alleged that, as a result of the alleged misrepresentations and omissions relating to the July 2014 Meeting, the price of Alibaba's ADS was artificially inflated during the Class Period, and that when the White Paper was published, for the first time revealing the facts and risks relating to the July 2014 Meeting, the price of Alibaba's ADS dropped $4.29 per share, causing investor losses.

The Complaint also alleged that Defendants made material misrepresentations and omissions in the IPO Registration Statement and during the Class Period relating to the SAIC's enactment of the "Red Shield Web Sword" program, an initiative to eliminate the sale of counterfeit goods on e-commerce platforms (hereafter, the "Red Shield Program"), implemented shortly before the IPO, and the impact that the Red Shield Program would likely have on Alibaba's business.

---

[1] Named Plaintiffs Abel Amoros, Arthur Gabriel, Raymond Lee, and Gang Liu were added as parties to the Complaint.

Finally, the Complaint also alleged that an additional $8.64 per ADS price drop experienced on January 29, 2015, following a disappointing earnings announcement for the fiscal quarter ending on December 31, 2014, was also related to and caused by the omitted facts and risks underlying the July 2014 Meeting and the Red Shield Program.

**Defendants' Motion to Dismiss the Complaint and Plaintiff's Response**

On July 31, 2015, Defendants moved to dismiss the Complaint for failure to state a claim. (Dkt. Nos. 16-18) Defendants argued that the Complaint failed to adequately plead: (a) that Defendants' nondisclosure of the July 2014 Meeting with Chinese regulators was an omission of material fact; (b) that Defendants made any actionable misrepresentations or omissions relating to the Red Shield Program; (c) facts suggesting that a material portion of Alibaba's revenue was derived from sales of counterfeit goods, causing Plaintiffs' claim that Alibaba was bound to suffer financial harm to also fail; (d) sufficiently particularized facts giving rise to a strong inference of scienter; and (e) loss causation as Plaintiffs did not provide any information to the public regarding the Red Shield Program or that Alibaba suffered material revenue loss from curtailing third-party sales of counterfeit merchandise.

More specifically, Defendants argued that Alibaba had no duty to disclose the July 2014 Meeting with the SAIC because its risk disclosures addressing governmental inquiries and its exposure to increased regulatory scrutiny were enough to satisfy any requirement under Form 20-F Item 5(d). Defendants also argued that Alibaba's non-disclosure of the existence of the Red Shield Program did not amount to an actionable omission because Alibaba's Registration Statement's risk disclosures sufficiently disclosed the existence of any governmental enforcement effort. Moreover, Defendants argued that allegations related to Alibaba facilitating

counterfeiting on its platforms were immaterial as a matter of law because the complaint in the *Gucci* Litigation already made all relevant information available to the public.

Regarding scienter, Defendants argued, *inter alia*, that the Complaint: (a) failed to demonstrate unusual trading sufficient to establish motive and opportunity on the part of two of the four Individual Defendants; (b) failed to allege particularized facts demonstrating Defendants' knowledge, or deliberate recklessness with respect to the July 2014 Meeting, or any other contradictory information at the time the alleged omissions were made regarding Alibaba's regulatory risk, the existence of the Red Shield Program, and the true state of Alibaba's business and operations.

Lastly, Defendants raised arguments that the Complaint failed to plead loss causation in connection with allegations related to the Red Shield Program and Alibaba's true state of its business and operations generally. Specifically, Defendants argued that the alleged corrective disclosure – the publication of the White Paper before the open of trading on January 28, 2015 – was insufficient to establish loss causation because there was no reference to either the Red Shield Program, or any effects of anti-counterfeiting initiatives generally on Alibaba's business, in the White Paper. Defendants claimed that Plaintiffs thus failed to allege a sufficient nexus between the disclosure and the alleged fraud.

On August 28, 2015, Plaintiffs filed and served their papers opposing Defendants' motion to dismiss. (Dkt. Nos. 20, 21) Plaintiffs sought to refute Defendants' arguments that Alibaba did not omit material information by demonstrating the significance of the July 2014 Meeting with the SAIC was due in part to the great power conferred upon the SAIC by the Red Shield Program and the number of high-ranking individuals from both sides in attendance. Plaintiffs also sought to refute Defendants' argument that Alibaba had no independent duty to disclose the July 2014

Meeting. They argued that once Defendants ventured to speak on the topics of the SAIC's regulation of Alibaba's business, counterfeiting, and the PRC regulatory environment, they had a duty to tell the whole truth. To Plaintiffs, the whole truth included the receipt of the administrative guidance at the July 2014 Meeting.

In addition, Plaintiffs argued that the Complaint sufficiently alleges a strong inference of scienter because the Individual Defendants were reckless when they disclaimed knowledge of the July 2014 Meeting by virtue of their high positions and active participation in Alibaba's business operations. Plaintiffs also maintained that the core operation doctrine supported a strong inference of scienter because the ongoing omission related directly to the core of Alibaba's business.

Lastly, Plaintiffs addressed Defendants' argument regarding loss causation. Plaintiffs argued that Defendants incorrectly attempted to parse out stand-alone allegations related to the Red Shield Program and the alleged impact to Alibaba's revenues. These allegations when considered in context with the July 2014 Meeting were sufficiently linked to the corrective disclosure on January 28, 2015.

**The Dismissal of the Complaint, and Plaintiffs' Successful Appeal to the Second Circuit**

On June 21, 2016, this Court granted Defendants' motion to dismiss in full with prejudice. (Dkt. No. 30 (the "Dismissal Order")). Noting "extensive cautionary disclosures" in Alibaba's IPO Registration Statement, this Court held that Plaintiffs failed to allege an actionable misrepresentation or omission. This Court likewise held that Plaintiffs failed to allege that Defendants acted with scienter. Finally, this Court concluded that amendment would be "futile" because "Defendants were under no duty to disclose the July 16 Meeting[,]" and thus denied

leave to amend. Absent Plaintiffs filing and winning the appeal, this dispositive decision would have resulted in zero recovery for the then putative class of allegedly aggrieved investors.

On July 20, 2016, Plaintiffs filed a notice of appeal to seek review of the Court's dismissal order by the United States Court of Appeals for the Second Circuit. (Dkt. No. 34)

On November 2, 2016, Plaintiffs filed their opening appellate brief with the Second Circuit. Plaintiffs argued that the Dismissal Order applied the incorrect standard when evaluating materiality by not crediting certain allegations in the Complaint. Specifically, Plaintiffs alleged that the SAIC threatened to impose massive financial penalties on Alibaba and that the "White Paper" was a reliable account of the July 2014 Meeting despite its removal from the SAIC's website. Plaintiffs also argued that the Dismissal Order incorrectly concluded that though motive and opportunity allegations against certain Individual Defendants were adequately alleged, they were not an independent basis for pleading scienter.

On February 1, 2017, Defendants filed their response. Defendants argued that the Dismissal Order correctly concluded that Plaintiffs failed to plead an actionable omission by alleging that Alibaba did not explicitly disclose the July 2014 Meeting with the SAIC. Specifically, Defendants argued that (1) no independent duty to disclose the informal and non-compulsory meeting existed under Item 303; (2) Alibaba candidly disclosed the regulatory environment and risks in detail including recently enacted regulations, such as the SAIC-promulgated measures, which were discussed at the July 2014 Meeting; (3) appropriate consideration was given to the publication of the "white paper" and allegations of threatened penalties; and (4) materiality is insufficient to establish falsity. Defendants also argued that the Court correctly determined that Plaintiffs failed to plead facts giving rise to a strong inference of scienter. Specifically, Defendants argued that (1) motive and opportunity allegations failed

because considering proceeds alone is insufficient when evaluating stock sales for purposes of scienter; and (2) the allegations related to conscious misbehavior or recklessness failed because Plaintiffs failed to identify any report or statement provided to any Individual Defendant that contained any fact suggesting the Registration Statement was in any way false or misleading.

On February 22, 2017, Plaintiffs filed their reply brief with the Second Circuit. Plaintiffs argued that: (1) Alibaba's disclosures of regulatory risks were materially misleading because they omitted that the SAIC actually threatened massive fines, that Alibaba did not think the meeting was immaterial because it persuaded the SAIC to hold the meeting behind closed doors, and that analysts and investors did not think that meeting was immaterial when they expressed alarm over the "white paper" and drove down Alibaba's stock price; and (2) the meeting's materiality did not depend on its level of formality because what mattered to investors was that the SAIC threatened to impose enormous sanctions unless Alibaba took costly compliance measures; and (3) Plaintiffs pled sufficient facts giving rise to a strong inference of scienter based on motive and opportunity and conscious misbehavior.

On May 10, 2017, the Second Circuit held oral argument on Plaintiffs' appeal, and on December 5, 2017, the Second Circuit vacated the Dismissal Order and remanded the case to this Court for further proceedings. *See Christina Asia Co. v. Ma et al.*, 718 F. App'x 20 (2d Cir. 2017).

**The Protective Order and the Case Timeline**

Following the Second Circuit's decision, the Parties began negotiating the protective order that would govern the treatment of evidence designated confidential or highly confidential through the resolution of the case.

On January 12, 2018, the Parties attended a scheduling conference with this Court to discuss, among other things, the discovery required and proposed timeline to accomplish the fact and expert discovery required.

On January 19, 2018, the Parties filed a stipulation proposing an agreed upon discovery schedule to the Court (the "Initial Scheduling Order"). (Dkt. No. 42) Also on January 19, 2018, the Parties filed the Stipulation and Protective Order Regarding Confidential Information and Highly Confidential Information (the "Protective Order"). (Dkt. No. 43) This Court endorsed both the proposed Scheduling Order and Protective Order the same day. (Dkt. No. 44)

**The Operative Omission Stipulation**

Following the Second Circuit's reversal of the Dismissal Order, the Parties met and coffered about entering into a stipulation to clarify the nature and scope of Plaintiffs' claims going forward in light of the Second Circuit's order.

On February 14, 2018, the Parties filed, and this Court signed, a stipulation in which the Parties agreed that "The operative omission of material fact alleged in this action was that Defendants failed to disclose the existence, content and significance of the July 16, 2014 administrative guidance meeting allegedly described in the 'White Paper Regarding the Administrative Guidance Provided to the Alibaba Group.'" (Dkt. No. 46)

**Class Certification and Defendants' Answer to the Complaint**

On March 12, 2018, Plaintiffs filed their opening motion to certify the action as a class action, seeking the Court's certification of a class comprised of all persons and/or entities that purchased or otherwise acquired Alibaba ADS, or purchased call options or sold put options on Alibaba ADS, during the period September 19, 2014, through January 28, 2015, inclusive, other

than those shares purchased directly in the IPO. Plaintiffs' motion included the expert report of Dr. David Tabak, which set forth the evidence in support of the efficiency of the market for Alibaba securities. (Dkt. Nos. 52-54)

On April 30, 2018, after deposing Plaintiffs' market efficiency expert, Defendants filed a notice of non-opposition to class certification. (Dkt. No. 55)

On May 1, 2018, the Court entered an order certifying the Class consisting of:

> all persons and/or entities that purchased or otherwise acquired Alibaba ADS, or purchased call options or sold put options on Alibaba ADS, during the period September 19, 2014, through January 28, 2015, inclusive, other than those shares purchased directly in the September 19, 2014 Initial Public Offering,[2] and appointed the Plaintiffs as the Class Representatives and the Rosen Firm, as Class Counsel.

(Dkt. No. 56)

On June 1, 2018, Defendants filed their answer to the Complaint. (Dkt. No. 57) In their Answer, Defendants continued to deny Plaintiffs' claims in their entirety, and asserted seven affirmative defenses, including, among other things, that: (1) Plaintiffs' claims were barred by Plaintiffs' actual and/or constructive knowledge of the alleged omitted information due to the fact that the information was already disclosed in the public domain at the time any of the challenged statements were made; (2) Plaintiffs failed to plead loss causation; and (3) the alleged misstatements and omissions were made in good faith and were based on what the speakers believed to be true at the time the statements were made.

---

[2] Excluded from the Class are: (a) persons who suffered no compensable loses; and (b) Defendants; the present and former officers and directors of Alibaba at all relevant times; members of their immediate families and their legal representatives, heirs, successors, or assigns; and any entity in which any of the Defendants, or any person excluded under this subsection (b), has or had a controlling interest at any time.

**Plaintiffs' Discovery Program**

Discovery in this action was both contentious and extensive. Discovery involved Lead Counsel's issuance of dozens of formal document and written discovery requests to Defendants and thirty-four (34) third parties, reviewing and analyzing written responses and objections to those requests, the exchange of many hundreds of emails and numerous pages of correspondence among counsel for the Parties and third parties, and, ultimately, the production of approximately 1.1 million pages of documents by Defendants and third parties. Lead Counsel also took twenty-two (22) fact depositions, including those of all five lead plaintiffs, retained seven experts, assisted in the preparation of five opening expert reports and six rebuttal expert reports, and prepared the experts for deposition.

**Mediation Efforts, Settlement Negotiations, and Preliminary Approval of the Settlement**

In the late summer of 2018, while Plaintiffs were pursuing fact discovery, the Parties began discussing a potential mediation to explore whether they could reach a settlement. The Parties agreed to participate in a private mediation and selected an esteemed mediator.

In advance of the mediation session, Plaintiffs' Counsel prepared a comprehensive mediation statement setting forth the facts relevant to the underlying alleged fraud, analyzing applicable law, and distilling discovery that had thus far been completed.

The parties exchanged opening mediation statements on August 17, 2018 and replies on August 28, 2018. Each of Plaintiffs' and Defendants' mediation statements discussed their respective analyses of the claims and defenses relating to liability and damages in this case. The parties prepared and finalized these submissions over a period of approximately seven weeks during which fact discovery was also taking place.

The first full-day mediation session took place in New York on September 6, 2018. The session ended without reaching a settlement.

Following the close of fact discovery on February 11, 2019, the Parties agreed to participate in another in-person mediation session to revisit the possibility of a settlement, which was subsequently scheduled for March 22, 2019.

Though the Parties did not reach an agreement to settle during the second in-person mediation session, the mediator believed it appropriate to recommend that the parties agree to settle within a specific range and/or at a specific number. Accordingly, the mediator recommended that the Parties agree to resolve the action. The mediator requested that the Parties respond to the recommendation in a "double blind" process through which neither side would know whether the other side had accepted.

The Parties thereafter accepted the mediator's recommendation and agreed to settle the action for a cash payment of $250 million. The terms of the Settlement were memorialized in a comprehensive and confidential term sheet, which the Parties executed on March 29-30, 2019 (the "Term Sheet").

The Term Sheet set forth, among other things, the Parties' agreement to settle and release all claims referenced therein in return for a cash payment of $250,000,0000 to be paid by Defendants for the benefit of the Class, subject to certain terms and conditions and the execution of a customary "long-form" stipulation and agreement of settlement and related papers.

Following additional negotiations, the Parties executed the Stipulation and Agreement of Settlement on April 26, 2019 (the "Stipulation"). On April 29, 2019, Plaintiffs submitted their Unopposed Motion for Preliminary Approval of Settlement and Approval of Dissemination of Notice to the Class. (Dkt. No. 122)

On May 1, 2019, the Court entered the Preliminary Approval Order, directing notice of the Settlement to be disseminated to prospective members of the Class. Dkt. No. 126

**Status of the Settlement Notice Program**

Pursuant to the Preliminary Approval Order, Lead Counsel, with the Court-approved Claims Administrator (SCS), implemented a notice program whereby notice was given to the members of the Class by mail, e-mail, and by publication.

The Court-approved Notice disclosed, among other things, the following information necessary to evaluate the benefits of the Settlement to the Class Members: (1) the amount of the Settlement Fund to be distributed to Authorized Claimants on a per share basis (estimated to be $0.57 per affected ADS, $0.14 per affected call option, and $0.24 per affected put option before the deduction of any Court approved fees, expenses and costs); (2) the Plan of Allocation; (3) that Lead Counsel would apply for an award of attorneys' fees for all Plaintiffs' Counsel in an amount not to exceed 25% of the Settlement Fund, plus interest, and expenses incurred in prosecuting the litigation in an amount not to exceed $5,000,000, and that any Class Member could object to the requested fee; (4) a detailed explanation of the reasons for the Settlement; (5) that requests for exclusion from the Settlement must be filed no later than September 25, 2019; (6) that objections to the Settlement, the Plan of Allocation, or the Fee Motion and Memorandum must be filed no later than September 25, 2019; and that the deadline for filing Proof of Claims is September 3, 2019.

To disseminate the Notice, SCS obtained information from Alibaba and from banks, brokers, and other nominees regarding the names and addresses of potential Class Members. The vast majority of all publicly traded ADS are held in street name by nominees who act as nominees for the benefit of the actual ADS holder. SCS, with the assistance of Plaintiffs'

Counsel, tracked nominee reporting and followed up with nominees to make sure Notice Packets were mailed to all identifiable purchasers of Alibaba securities during the Class Period.

As of Wednesday, October 16, 2019, more than 1,000,000 Notice Packets had been sent to potential Class Members. SCS physically mailed 828,157 copies of the Notice Packet, and emailed 1,721 copies of the Notice Packet. One nominee, Broadridge, elected to email notice of the Settlement to 256,313 of its customers who are potential Class Members, including links to the Notice and Claim Form on the settlement website.

In addition to the direct dissemination efforts, SCS posted the Notice and Claim Form, along with other case-related documents, including the Stipulation of Settlement, online at www.alibabasettlement.com. All documents are downloadable and Class Members have the option of submitting Claim Forms online. SCS ran keyword search advertisements to increase website traffic and make the website more easily located by potential Class Members.

SCS also caused the Summary Notice to be published once in each of the *Investor's Business Daily, Barron's, The New York Times*, and *The Wall Street Journal*, and transmitted once over the *PR Newswire* on June 3, 2019.

On or about May 3, 2019, a case-specific toll-free phone number was established with an Interactive Voice Response system and operators during business hours. The automated attendant answers the calls and presents callers with a series of common questions and answers. If callers need further assistance, they have the option to be transferred to an operator during business hours.

**Status of Exclusion Requests and Objections**

The Notice informed potential Class Members that written requests for exclusion were to be mailed such that they were received no later than September 25, 2019. Both Lead Counsel and SCS monitored receipt of such exclusions. They received thirty exclusion requests. Out of the requests for exclusion, fourteen provided the information required for a valid exclusion; seven did not provide the required information; eight provided the information required, however, they would not be eligible to receive a portion of the Settlement if a Claim Form was filed; and one does not clearly identify itself as an exclusion request. SCS mailed letters to the individuals requesting exclusion with insufficient documentation, notifying them that their request was invalid and that the transaction and holding information was needed in order for their exclusion request to be assessed.

The Plan of Allocation was designed to allocate the proceeds of the Settlement Fund fairly among Class Members based on the losses they suffered on transactions in Alibaba Securities that were attributable to the conduct alleged in the Complaint.

No objections to the proposed Plan of Allocation were received.

According to the Notice, Class Members seeking to object to the Settlement, the proposed Plan of Allocation or Lead Counsel's motion for an award of attorneys' fees and reimbursement of Litigation Expenses were required to submit their objection in writing such that the request was received by Lead Counsel and Defendants' Counsel, as well as filed with the Clerk of the Court's Office no later than September 25, 2019. Lead Counsel received one objection.

On August 28, 2019, Lead Counsel received from Christopher King an Objection to Proposed Class Action Settlement, dated August 21, 2019. The next day, on August 29, 2019,

Lead Counsel set two letters, one via U.S. overnight mail and one via U.S. registered mail, to Mr. King requesting he provide Lead Counsel a list of his purchases of Alibaba securities during the Class Period or some other evidence of his membership in the Class, as required by ¶ 15 of the Court's May 1, 2019 Order Preliminarily Approving Settlement and Providing for Notice. Lead Counsel did not receive any response from Mr. King.

**Allocation of the Net Proceeds of the Settlement and the Fee and Expense Application**

Pursuant to the Preliminary Approval Order (Dkt. No. 126), and as set forth in the Notice, all Class Members who wanted to participate in the distribution of the Net Settlement Fund were required to submit a valid Claim Form with all required information submitted online or postmarked no later than September 3, 2019. The Net Settlement Fund will be distributed among Authorized Claimants according to the Plan of Allocation.

In addition to seeking final approval of the Settlement Plan and Plan of Allocation, Lead Counsel applied for a fee award of 25% of the Settlement Fund on behalf of all Plaintiffs' Counsel. Lead Counsel also requested reimbursement in the amount of $4,000,303.34 (which includes $3,937,803.35 in unreimbursed costs incurred by Plaintiff's Counsel and $62,500.00 total for the Class Representatives).

The Court concludes that the Stipulation of Settlement is, in all respects, fair, reasonable and adequate to the Class and is therefore approved. *See* Fed. R. Civ. P. 23(e)(2).

## DISCUSSION

## I. GENERAL RULES ON APPROVING SETTLEMENT OF CLASS ACTIONS

The law favors compromise and settlement of class action suits. *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) (noting the "strong judicial policy in favor of

settlements, particularly in the class action context") (internal quotation marks and citation omitted); *see also* Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 11.41 (4th ed. 2002) ("The compromise of complex litigation is encouraged by the courts and favored by public policy.").

The approval of a proposed class action settlement is a matter of discretion. *See Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1079 (2d Cir. 1995). "[C]ourts should give proper deference to the private consensual decision of the parties . . . [and] should keep in mind the unique ability of class and defense counsel to assess the potential risks and rewards of litigation . . . ." *Clark v. Ecolab*, 2009 WL 6615729, at *3 (S.D.N.Y. Nov. 27, 2009) (citations omitted).

"Fairness is determined upon review of both the terms of the stipulation and the negotiating process that led to such agreement." *Frank v. Eastman Kodak Co.*, 228 F.R.D. 174, 184 (W.D.N.Y. 2005). "Absent fraud or collusion, [courts] should be hesitant to substitute [their] judgment for that of the parties who negotiated the settlement." *In re EVCI Career Colls. Holding Corp. Sec. Litig.*, 2007 WL 2230177, at *4 (S.D.N.Y. July 27, 2007).

Courts in the Second Circuit have long considered the following factors set forth in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974), in evaluating whether a class action settlement is fair, reasonable, and adequate under Rule 23:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Id.* at 463, *abrogated on other grounds by Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000). Moreover, "not every factor must weigh in favor of [the] settlement, rather the court should consider the totality of these factors in light of the particular circumstances." *In re Glob. Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 456 (S.D.N.Y. 2004).

Rule 23(e)(2), as amended on December 1, 2018, also instructs that the Court should determine whether the Settlement is "fair, reasonable, and adequate" after considering whether:

> (A) the class representatives and class counsel have adequately represented the class;
> (B) the proposal was negotiated at arm's length;
> (C) the relief provided for the class is adequate, taking into account:
> (i) the costs, risks, and delay of trial and appeal;
> (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
> (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
> (iv) any agreement required to be identified under Rule 23(e)(3); and
> (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

The factors set forth in Rule 23(e)(2) have been applied in tandem with the Second Circuit's *Grinnell* factors and "focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal." Advisory Committee Notes to 2018 Amendments, 324 F.R.D. 904, 918 (Apr. 26, 2018); *see also In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11, 29 (E.D.N.Y. Jan. 28, 2019) ("The Court understands the new Rule 23(e) factors to add to, rather than displace, the *Grinnell* factors.").

As demonstrated herein, the Settlement readily satisfies the factors set forth in Rule 23(e)(2) and *Grinnell* and, accordingly, warrants final approval.

## II. THE SETTLEMENT IS FAIR IN LIGHT OF RULE 23 AND THE GRINNELL FACTORS

Pursuant to Fed. R. Civ. P. 23(e), courts routinely approve settlements of a class action such as the instant one. "Settlement approval is within the Court's discretion, which 'should be exercised in light of the general judicial policy favoring settlement.'" *In re Sumitomo Copper Litig.*, 189 F.R.D. 274, 280 (citation omitted); *see also Wal-Mart Stores*, 396 F.3d at 116 (noting the "strong judicial policy in favor of settlements, particularly in the class action context") (internal quotation marks and citation omitted); Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 11.41 (4th ed. 2002) ("The compromise of complex litigation is encouraged by the courts and favored by public policy.").

However, courts may approve a settlement only if it determines that the settlement is "fair, adequate, and reasonable, and not a product of collusion." *Joel A. v. Giuliani*, 218 F.3d 132, 138 (2d Cir. 2000). In undertaking this analysis, courts must consider "both the settlement's terms and the negotiating process leading to settlement." *Wal-Mart Stores*, 396 F.3d at 116. In other words, courts must review settlements for both procedural and substantive fairness.

### *1. Procedural Fairness*

Rule 23(e)(2)(A), which requires adequate representation, and Rule 23(e)(2)(B), which requires arm's-length negotiations, "constitute the 'procedural' analysis" of the fairness inquiry. *Payment Card*, 330 F.R.D. at 29 (citation omitted). When the terms of a proposed settlement were reached by qualified, experienced counsel during arm's-length negotiations undertaken after meaningful discovery, a presumption of fairness may attach to a proposed settlement. *Wal-Mart Stores*, 396 F.3d at 116. Further, the participation of a neutral and respected mediator is an indicator of a settlement's procedural fairness. *D'Amato v. Deutche Bank*, 236 F.3d 78, 85 (2d

Cir. 2001) ("mediator's involvement in ... settlement negotiations helps to ensure that the proceedings were free of collusion and undue pressure.").

Here, this Court deems that this settlement enjoys the presumption of fairness because (a) all parties in this action are represented by qualified counsel experienced in litigating securities and other complex litigation; (b) counsel have furnished adequate evidence that the settlement was the product of thorough, arm's-length negotiation, facilitated by a neutral and well-respected mediator; and (c) before settlement was ultimately reached, the case proceeded well into both class certification and merits discovery; to wit, Plaintiffs' counsel reviewed and analyzed over 1.1 million pages of documents produced by defendants, participated in numerous meet and confer sessions with defense counsel to resolve discovery disputes, took twenty-two (22) fact depositions, including those of all five lead plaintiffs, retained seven experts, assisted in the preparation of five opening expert reports and six rebuttal expert reports, and prepared the experts for deposition. There being no evidence to rebut the presumption of procedural fairness here, the Court concludes that the settlement was procedurally fair.

***2. Substantive Fairness***

Rule 23(e)(2)(C) instructs the Court to consider whether "the relief provided for the class is adequate, taking into account ... the costs, risks, and delay of trial and appeal" along with other relevant factors. Fed. R. Civ. P. 23(e)(2)(C). Rule 23(e)(2)(C)(i) incorporates the factors set out in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir.1974), and courts in this Circuit have long utilized the *Grinnell* nine-factor test in determining whether a settlement is substantively fair, reasonable, and adequate. *See, e.g., Ouellette v. Cardenas (In re Sony Corp. SXRD)*, 2011 WL 4425361, at *2 (2d Cir. Sept. 23, 2011) (summary order).

> The factors to be considered are: (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*McReynolds v. Richards-Cantave,* 588 F.3d 790, 804 (2d Cir. 2009). Each factor will be considered in turn.

*(a) The complexity, expense and likely duration of the litigation*

The "complexity, expense and likely duration of the litigation" are factors that courts consider in evaluating a proposed settlement for approval. *Grinnell,* 495 F.2d at 463; *In re Drexel Burnham Lambert Group Inc.*, 130 B.R. 910, 927 (S.D.N.Y.1991). "In evaluating the settlement of a securities class action, federal courts, including this Court, have long recognized that such litigation is notably difficult and notoriously uncertain." *Sumitomo,* 189 F.R.D. at 281. As such, settlement is favored where "trial of [the] class action would be a long, arduous process requiring great expenditures of time and money on behalf of both the parties and the court." *In re Prudential Ins. Co. Am. Sales Practice Litig.*, 148 F.3d 283, 318 (3d Cir.1998). That would seem to be the case here.

Among other things, determining liability in the instant case would involve thorny issues of Chinese regulatory, administrative, intellectual property, and consumer protection law, familiarity with Chinese politics and business practices, issues of e-commerce and counterfeiting in China, and due diligence standards for underwriting transactions involving Chinese companies. As a practical matter, this case would be particularly onerous and expensive to litigate given that it involves litigating against a foreign defendant. It would necessarily require

the expense of travelling to Hong Kong to depose Defendant's witnesses though interpreters, and the costly translation of many Chinese documents. Further, the action was only settled after over four years of litigation and near the end of expert discovery. If Plaintiffs' claims were to survive summary judgment, they would undoubtedly be faced with the expenses of litigating the action through trial and post-trial appeals. For all these reasons, the complexity, expense and duration of the litigation support approval of the settlement. The first *Grinnell* factor therefore weighs in favor of approval. *See Johnson*, 2011 WL 4357376, at *9.

*(b) The reaction of the class to the settlement*

The second *Grinnell* factor – a positive reaction of the Class to the proposed Settlement – is a further factor favoring its approval by the Court. *See Grinnell,* 495 F.2d at 462; *Maley,* 186 F.Supp.2d at 362–63 ("It is well-settled that the reaction of the class to the settlement is perhaps the most significant factor to be weighed in considering its adequacy."); *In re American Bank Note Holographics,* 127 F.Supp.2d 418, 425 (S.D.N.Y.2001). This factor overlaps with Rule 23(e)(4), on the opportunity for exclusion, and Rule 23(e)(5), on the opportunity to object.

As a threshold matter, the Settlement allows Class Members the opportunity to object to and request exclusion from the Settlement, in satisfaction of Rule 23(e)(4) and (5). Indeed, no class members[3] have objected to the Settlement, and few have opted out. When considering the

---

[3] The lone Objector states "upon information and belief" that he "acquired or sold 100 Alibaba ADS during the Class Period." Ex. 27 at 2. This is not enough to establish membership in the class. The Objector failed to remedy this fatal deficiency even after Lead Counsel sent him two separate letters requesting that he do so. Only a Class member may object to the Settlement. *In re Drexel Burnham Lambert Grp., Inc.*, 130 B.R. 910, 923 (S.D.N.Y. 1991), *aff'd*, 960 F.2d 285 (2d Cir. 1992) ("Only Class members have standing to object to the Settlement of a class action" because "Objectors who are non-Class members lack standing to object to the fairness, reasonableness and adequacy of the Settlement.").

large volume of Claim Forms submitted as of now – 164,000 – the reaction of the class to date supports approval of the Settlement.

*(c) The stage of the proceedings and discovery completed*

When considering this *Grinnell* factor, "the question is whether the parties had adequate information about their claims," *In re Global Crossing Sec. and ERISA Litig.*, 225 F.R.D. 436, 458 (S.D.N.Y. 2004), such that counsel "possessed a record sufficient to permit evaluation of the merits of Plaintiffs' claims, the strengths of the defenses asserted by Defendants, and the value of Plaintiffs' causes of action for purposes of settlement." *Maley,* 186 F.Supp.2d at 364. This factor, too, weighs in favor of approving the settlement.

The Court concludes that the Parties have sufficient information to make an intelligent appraisal of the value of the case by assessing the strengths and weaknesses of the claims. The case has progressed to the point where Plaintiffs' counsel has conducted significant legal and factual investigation into the claims asserted, has opposed Defendants' motion to dismiss the initial complaint, obtained class certification, successfully navigated an appeal, and engaged in extensive discovery including reviewing more than 1.1 million pages of documents, the preparation of experts for depositions, and taking twenty-two fact witness depositions, and defending Plaintiffs' depositions. Clearly, the Settlement was negotiated only after the Parties had adequate familiarity with the case and its merits.

*(d) The risks of establishing liability and damages*

In considering this factor, "the Court need only assess the risks of litigation against the certainty of recovery under the proposed settlement." *Global Crossing*, 225 F.R.D. at 459. Securities litigation is unpredictable because it involves complex issues of fact and law, and this

case is no exception. *Maley,* 186 F.Supp.2d. at 364 (citing *Zerkle v. Cleveland–Cliffs Iron Co.*, 52 F.R.D. 151, 159 (S.D.N.Y.1971) ("Stockholder litigation is notably difficult and unpredictable.")). Here, Plaintiffs faced the risk of failing to prove that Alibaba made a material omission or false statement in their Registration Statement or otherwise during the Class Period. When compared to the certainty of the benefits of the Settlement, that risk militates against further litigation, and supports the conclusion that the Settlement is fair, reasonable and adequate.

**i. Establishing Liability**

The Parties reached the Settlement a short time before Defendants' summary judgment motion was due. Of course, summary judgment posed risks to the survival of the Class's claims and could have resulted in dismissal or a material reduction in damages.

Moreover, assuming Plaintiffs' claims withstood Defendants' motion, Plaintiffs faced the further risk of proving to a jury that Defendants made no material omission or false statement in Alibaba's Registration Statement or otherwise during the Class Period. Defendants marshalled a series of arguments in favor of its position. First, Defendants argued that the July 16, 2014 administrative guidance meeting with the SAIC (the "July 2014 Meeting") was a routine regulatory interaction that resulted in Alibaba's voluntary efforts to improve its sales platforms; second that the meeting was not a material event; and third that its disclosure was not required. Defendants argued further that any regulatory risks raised by the July 2014 Meeting were thoroughly disclosed in the Registration Statement.

The Court agreed with Defendants at the motion to dismiss phase, and even after the appeal, Plaintiffs' ability to prove otherwise at trial was not a foregone conclusion. For example, while an

important allegation in Plaintiffs' case was the SAIC's threat of a large fine during the July 2014 Meeting, *see Christine Asia Co. Ltd. v. Ma*, 718 F. App'x 20, 22-23 (2d Cir. 2017), Defendants maintained that the alleged "threat" was not real (and thus not material), and thus there was no duty to disclose it. Indeed, since there ultimately was no adjudication of wrongdoing nor any fine levied against Alibaba stemming from the July 2014 Meeting, a jury may have been swayed by Defendants' arguments.

Even if Plaintiffs convinced a jury that the failure to disclose the July 2014 Meeting was a material omission, Plaintiffs also faced the risk that a jury would conclude that Defendants did not act with the requisite scienter. Proving scienter is hard to do. *See, e.g.*, *Kalnit v. Eichler*, 99 F. Supp. 2d 327, 327 (S.D.N.Y. 2000) ("The element of scienter is often the most difficult and controversial aspect of a securities fraud claim."). To prove scienter, Plaintiffs would need to convince a jury that Defendants intentionally, or with extreme recklessness, omitted the July 2014 Meeting from the Registration Statement to mislead investors as to the risks posed by the event.

As with falsity, although Plaintiffs uncovered significant evidence that they believe supported a finding of Defendants' scienter, Defendants would have marshalled substantial evidence in opposition. For example, Alibaba has maintained that the Company did not purposely conceal the July 2014 Meeting because, according to Alibaba and its employees, the meeting was a routine interaction with a regulator; it was not a material event intentionally hidden from investors. Moreover, Defendants have consistently argued that Alibaba had no motive to conceal the Meeting or the administrative guidance provided by the SAIC because the changes Alibaba was making to its platforms in response to the SAIC's recommendations would only improve Alibaba's platforms and business. Furthermore, Defendants argued that none of the Individual Defendants were present at the Meeting, nor were they aware of it. If they were to convince a jury

of this, Plaintiffs would not be able to prove that any of the Individual Defendants intentionally or recklessly concealed information about which they were not even aware.

The combination of the foregoing arguments may have swayed a jury to believe that even if the failure to disclose the July 2014 Meeting in the Registration Statement constituted a material omission, it was not done intentionally or recklessly by Defendants to mislead investors.

**ii. Establishing Damages**

Assuming that Plaintiffs established liability by overcoming the formidable risks detailed above, Plaintiffs would have confronted considerable challenges in establishing loss causation and damages. Prior to reaching the Settlement, Plaintiffs already were forced to admit an inability to prove loss causation with respect to one of the corrective disclosure dates initially alleged in the action.

While Plaintiffs have a solid argument that loss causation would be proven for the $4.29 residual price drop on January 28, 2015 following the publication of the White Paper, Defendants raised numerous counter arguments. For example, Defendants argued that the White Paper was not an accurate record of the SAIC's position at the July 2014 Meeting and was, instead, the action of an overzealous SAIC administrator *mis*-titled as a White Paper. As such, Defendants argued, the White Paper was not a corrective disclosure at all. Alternatively, Defendants asserted that the unusual method of disclosure of the administrative guidance in an unsanctioned White Paper caused the share price decline, rather than the facts contained in the White Paper. Defendants argued that if the unorthodox method of disclosure of the White Paper, as opposed to its contents, caused the price drop, Plaintiffs were not entitled to damages.

Defendants also asserted that the Registration Statement and other publicly available

information had already disclosed the adverse information contained in the White Paper concerning counterfeit products and other potential violations on Alibaba's e-commerce platforms, such that there could be no provable loss causation associated with the January 28 price drop. Lastly, Defendants contended that because the SAIC later retracted the White Paper, the January 28 share price decline was not fairly charged to Defendants as the SAIC had disowned it. As a result of their various loss causation arguments, Defendants asserted that damages related to the failure to disclose the July 2014 Meeting were zero, or at most, some amount substantially less than the Settlement amount.

The Parties developed and would have presented competing evidence on these issues, including competing expert evidence. While Plaintiffs proceeded as though they had the better arguments, the risk remained that Defendants could have defeated loss causation, or significantly diminished damages, for the one remaining alleged corrective disclosure date.

*(e) The risks of maintaining the class action through trial*

Rule 23 provides that a class certification order may be altered or amended any time before a decision on the merits. Fed. R. Civ. P. 23(c)(1)(C). Thus, while certification-related risks were not dire, a risk remained that the Class definition could be modified, or the Class decertified. Plaintiffs faced the risk that had this case, gone to trial, Defendants would have opposed class certification and would have also sought to remove some or all of the lead plaintiffs from the case. The Court therefore finds that the risk of maintaining a class through trial supports the approval of a settlement in this case.

*(f) The ability of the defendants to withstand a greater judgment*

Plaintiffs concede it is likely that Alibaba could have withstood a judgment greater than $250 million, but correctly note that "where, as here, the other *Grinnell* factors weigh in favor of approval, this factor alone does not suggest the settlement is unfair." *In re Sony SXRD Rear Projection Television Class Action Litig.*, 2008 WL 1956267, at *8 (S.D.N.Y. May 1, 2008). Indeed, "a defendant is not required to 'empty its coffers' before a settlement can be found adequate." *Id.* at *8.

*(g) The range of reasonableness of the settlement fund in light of the best possible recovery and the attendant risks of litigation*

The adequacy of the amount achieved in settlement may not be judged "in comparison with the possible recovery in the best of all possible worlds, but rather in light of the strengths and weaknesses of plaintiffs' case." *In re "Agent Orange" Prod. Liab. Litig.*, 597 F. Supp. 740, 762 (E.D.N.Y.1984), *aff'd,* 818 F.2d 145 (2d Cir.1987). Instead, "there is a range of reasonableness with respect to a settlement." *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972); *Shapiro*, 2014 WL 1224666, at *11 (settlement judged "not in comparison with the possible recovery in the best of all possible worlds, but rather in light of the strengths and weaknesses of plaintiffs' case").

In this case, the Court finds that the settlement amount falls squarely within the range of reasonableness. Plaintiffs' expert estimated that maximum recoverable Class-wide damages in the Action are approximately $1,455,300,000, based on per share artificial inflation of $4.29 per ADS. The Settlement thus represents approximately 17% of maximum recoverable damages. As set forth above, however, Defendants presented alternative arguments attacking loss causation and arguing that recoverable damages are zero. Moreover, Defendants argued that even assuming Plaintiffs were able to prove that all the residual price decline on January 28, 2015 was caused by revelation of the previously concealed July 2014 Meeting, an alternative

aggregate damages model should apply. Defendants argued that under this alternative model, (i) Plaintiffs' per-share damages were less than $4.29 per share based on a market model using different industry indices, and (ii) based on different trading assumptions for the ADSs purchased and sold during the Class Period, aggregate Class-wide damages were only at most $1.23 billion. Under this scenario, the Settlement represents a 20% recovery. The recovery under either scenario (*i.e.*, a 17% to 20% recovery) is reasonable when viewed against the risks of continued litigation, and the real potential for a zero recovery. *See In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, No. 02 MDL 1484 (JFK), 2007 WL 313474, at *10 (S.D.N.Y. Feb. 1, 2007) (recovery of approximately 6.25% was "at the higher end of the range of reasonableness of recovery in class action[] securities litigations").

### 3. *The Remaining Rule 23(e) Factors*

#### *(a) The Proposed Method of Distribution to the Class Is Effective (Rule 23(e)(2)(C)(ii))*

The Settlement proceeds will be allocated to Class Members who submit valid Claim Forms in accordance with the Plan of Allocation. The Claims Administrator, Strategic Claims Services ("SCS"), will review and process all Claim Forms received, provide claimants with an opportunity to cure any deficiency in their claim or request review of the denial of their claim, and ultimately mail a check to or wire Authorized Claimants their *pro rata* share of the Net Settlement Fund as calculated under the Plan of Allocation, upon approval of the Court. This type of claims processing and method for distributing settlement proceeds is standard in securities and other class actions and is effective. Moreover, the Settlement is not "claims-made"—none of the Settlement will revert to Alibaba.

#### *(b) The Proposed Award of Attorneys' Fees Is Fair and Reasonable (Rule 23(e)(2)(C)(iii))*

The relief provided for the Class is also adequate when the terms of the proposed award of attorneys' fees are considered. As discussed below, the proposed attorneys' fees of 25%, to be paid upon approval by the Court, are reasonable in light of the work of Plaintiffs' Counsel, their investment of resources in the case, their prosecution of the action for the benefit of the Class, the risks that they faced in the litigation, and the overall benefit of the Settlement achieved. Most importantly, with respect to the Court's consideration of the Settlement's fairness, the approval of attorneys' fees is entirely separate from approval of the Settlement; neither Plaintiffs nor Plaintiffs' Counsel may terminate the Settlement based on the ultimate award of attorneys' fees or expenses.

*(c) Identification of Agreements in Connection with the Settlement (Rule 23(e)(2)(C)(iv) and Rule 23(e)(3))*

The Parties entered into a confidential agreement establishing conditions under which Defendants may terminate the Settlement if a certain threshold of Class Members submit valid and timely requests for exclusion. This type of agreement is standard in securities class action settlements and has no negative impact on the fairness of the Settlement. *See Erica P. John Fund, Inc. v. Halliburton Co.*, No. 3:02-cv-1152, 2018 WL 1942227, at *5 (N.D. Tex. Apr. 25, 2018) (approving settlement with similar confidential agreement).

*(d) The Settlement Treats Class Members Equitably Relative to Each Other (Rule 23(e)(2)(D))*

Rule 23(e)(2)(D) requires that the Court assess whether "the proposal treats class members equitably relative to each other." The Settlement does that. All Authorized Claimants will

receive their *pro rata* share of the Net Settlement Fund based on the amount of their Recognized Loss calculated under the Plan of Allocation. (Ex. 1-A (Notice at pp. 14-26))

***

In sum, each of the relevant *Grinnell* and Rule 23(e) factors weighs in favor of final approval of the settlement. Since the settlement, on its face, is "fair, adequate, and reasonable, and not a product of collusion," *Frank*, 228 F.R.D. at 184 (quoting *Joal A. v. Giuliani*, 218 F.3d 132, 138-39 (2d Cir. 2000)), the Court grants final approval of the settlement. For the foregoing reasons, it is ORDERED that the settlement is approved as fair, reasonable, and adequate.

## III. THE PLAN OF ALLOCATION IS FAIR AND REASONABLE

"To warrant approval, the plan of allocation must also meet the standards by which the settlement was scrutinized – namely, it must be fair and adequate." *In re WorldCom, Inc. Sec. Litig.*, 388 F.Supp.2d 319, 344 (S.D.N.Y.2005) (quoting *Maley v. Del Global Technologies Corp.*, 186 F.Supp.2d 358, 367). As numerous courts have held, a plan of allocation need not be perfect. *RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*, 2000 WL 420548, at *2 (S.D.N.Y. Apr. 18, 2000) ("aggregate damages in securities fraud cases are generally incapable of mathematical precision") (citing *In re Oracle Sec. Litig.*, 829 F.Supp. 1176, 1182 (N.D.Cal.1993)). Rather, "An allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel." *WorldCom*, 388 F.Supp.2d at 344 (quoting *Maley*, 186 F.Supp.2d at 367); *accord In re Nasdaq*, 2000 WL 37992, at *2 (S.D.N.Y. Jan. 18, 2000). Thus, "In determining whether a plan of allocation is fair, courts look primarily to the opinion of counsel." *EVCI*, 2007 WL 2230177, at *11.

The proposed Plan of Allocation, developed by Plaintiffs' expert in conjunction with Plaintiffs' Counsel, reflects an assessment of the damages that Plaintiffs contend could have been recovered under the theories of liability asserted in the action. The Plan has a clear rational basis, equitably treats the class members, and was devised by experienced and estimable class counsel; the Court accordingly finds it to be fair and adequate. It is therefore ORDERED that the plan of allocation is approved.

## IV. THE NOTICE PROGRAM SATISFIES RULE 23 AND DUE PROCESS

Rule 23(e) and due process together require that notice of a settlement be "reasonable"—*i.e.*, it must "fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings." *Wal-Mart Stores*, 396 F.3d at 114 (noting "There are no rigid rules to determine whether a settlement notice to the class satisfies constitutional or Rule 23(e) requirements"); *see also Merrill Lynch Research*, 246 F.R.D. at 166 ("Notice need not be perfect, but need be only the best notice practicable under the circumstances, and each and every class member need not receive actual notice, so long as class counsel acted reasonably in choosing the means likely to inform potential class members.").

Both the substance of the Notice and the method of its dissemination to the Class satisfies those standards here. In accordance with the Preliminary Approval Order, SCS disseminated more than 1,000,000 Notice Packets to potential Class Members.

The Notice informs Class Members of, among other things: (1) the nature of the action; (2) the definition of the Class; (3) the claims and defenses asserted; (4) a description of the terms of the Settlement; (5) the right of a Class Member to enter an appearance; (6) the right of a Class Member to request exclusion from the Class, and instructions, manner, and time for doing so;

(7) the right of a Class Member to object to any aspect of the Settlement, and the instructions, manner, and time for doing so; (8) the binding effect of the Settlement on Class Members that do not elect to be excluded; and (9) the date and time of the final Settlement Hearing. *See* Fed. R. Civ. P. 23(c)(2)(B). The Notice also advises that Plaintiffs' Counsel will apply to the Court for an award of attorneys' fees in an amount not to exceed 25% of the Settlement Fund as well as reimbursement of Litigation Expenses, including awards of up to $12,500 to each of the five representative Plaintiffs.

In addition to mailing more than 1,000,000 copies of the Notice Packet, SCS caused the Summary Notice to be published once in each of *Investor's Business Daily*, *Barron's*, *The New York Times*, and *The Wall Street Journal*, and transmitted once over the *PR Newswire* on June 3, 2019. SCS also posted the Notice, Claim Form, Stipulation of Settlement, and other important case documents on a website dedicated the Settlement (www.AlibabaSettlement.com), and bought strategic keyword search ads to ensure the Settlement website would be prominently displayed in search results. SCS also established a toll-free number to respond to Class Member inquiries, and received over 3,500 calls.

These various methods of notice provided all of the necessary information for Class Members to make an informed decision regarding the Settlement. Moreover, the combination of Notice Packets sent individually by first-class mail and/or e-mail to those Class Members who could be identified with reasonable effort, combined with the print and Internet-based publication of Settlement documents was "the best notice . . . practicable under the circumstances." Fed. R. Civ. P. 23(c)(2)(B); *see, e.g.*, *Dornberger v. Metro. Life Ins. Co.*, 203 F.R.D. 118, 123-24 (S.D.N.Y. 2001) (approving notice plan and concluding that "reasonable efforts were taken to

notify all members of the class" where part of the class received direct mail notice and part of the class was covered by publication notice).

## V. PLAINTIFFS' COUNSEL ARE ENTITLED TO AN AWARD OF ATTORNEYS' FEES FROM THE $250 MILLION SETTLEMENT FUND

The Supreme Court and the Second Circuit have long recognized that attorneys whose efforts create a "common fund" are entitled to a reasonable attorneys' fee from that fund. *See Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 47 (2d Cir. 2000). "The rationale for the doctrine is an equitable one: it prevents unjust enrichment of those benefitting from a lawsuit without contributing to its cost." *Goldberger*, 209 F.3d at 47; *see also In re Veeco Instruments Inc. Sec. Litig.*, No. 05 MDL 01695 (CM), 2007 WL 4115808, at *2 (S.D.N.Y. Nov. 7, 2007). Awarding reasonable attorneys' fees from a common fund also serves an important policy goal: It encourages "skilled counsel to represent those who seek redress for damages inflicted on entire classes of persons," and thus discourages "future misconduct of a similar nature." *Veeco*, 2007 WL 4115808, at *2; *see also Hicks v. Morgan Stanley & Co.*, No. 01 Civ. 10071 (RJH), 2005 WL 2757792, at *9 (S.D.N.Y. Oct. 24, 2005).

For the common fund doctrine to apply, "the applicant's efforts must confer a 'substantial benefit on the members of an ascertainable class.'" *Maley v. Del Glob. Techs. Corp.*, 186 F. Supp. 2d 358, 369 (S.D.N.Y. 2002) (quoting *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 393-94 (1970)). Where "the court's jurisdiction over the subject matter of the suit makes possible an award that will operate to spread costs proportionately among [the class],' an award of attorneys' fees must operate to shift the costs of litigation to that group." *Id.*

All those elements are present here. Lead Counsel's efforts have conferred a substantial benefit – $250 million in cash – on an ascertainable class. And a fee award from the common fund

will equitably shift the costs of litigation to the group benefitting from the Settlement, *i.e.*, the Class. Accordingly, the Court will award attorneys' fees from the Settlement Fund.

## VI. A FEE AWARD OF 25% OF THE SETTLEMENT FUND IS FAIR AND REASONABLE IN THIS CASE

The Second Circuit permits courts to award attorneys' fees in common fund cases under either of two methods, the "percentage of the fund" method or the "lodestar" method. *McDaniel v. Cty. of Schenectady*, 595 F.3d 411, 417 (2d Cir. 2010). While courts have the discretion to choose whichever method is appropriate to the circumstances of a case, the "trend in this Circuit is toward the percentage method," with the lodestar serving only as a "cross-check" on the resulting fee. *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 121, 123 (2d Cir. 2005). Here, the Court applies the "percentage of the fund" method. Under this approach, courts consider various factors in assessing the reasonableness of a fee, including: (1) the amount of the requested fee in relation to the settlement; (2) the risks of the litigation; (3) the magnitude and complexities of the litigation; (4) the quality of representation; (5) public policy considerations; and (6) the time and labor expended by counsel. *Goldberger*, 209 F.3d at 50.

The requested fee is reasonable under the percentage-of-recovery approach. Indeed, it is well within the norm for similar settlements, and application of the remaining *Goldberger* factors confirms its reasonableness.

### *1. The Fee Is Reasonable in Relation to the Settlement*

Where a court awards fees based on the percentage-of-recovery method, the key *Goldberger* factor is, of course, "the [amount of the] requested fee in relation to the settlement." 209 F.3d at 50. "When determining whether a fee request is reasonable in relation to a

settlement amount, 'the court compares the fee application to fees awarded in similar securities class-action settlements of comparable value.'" *In re Comverse Tech., Inc., Sec. Litig.*, No. 06-CV-1825 (NGG), 2010 WL 2653354, at *3 (E.D.N.Y. June 24, 2010). That factor strongly favors the 25% fee request in this case.

District courts in the Second Circuit routinely award fees upwards of 25% in securities and other complex litigation settlements of comparable size. *See Velez v. Novartis Pharm. Corp.*, No. 04 Civ. 09194 (CM), 2010 WL 4877852, at *21 (S.D.N.Y. Nov. 30, 2010) (collecting authorities while awarding 25% of $152.5 million in that particular case); *see also In re Beacon Assocs. Litig.*, No. 09 Civ. 3907 (CM), 2013 WL 2450960, at *5 (S.D.N.Y. May 9, 2013) ("In this Circuit, courts routinely award attorneys' fees that run to 30% and even a little more of the amount of the common fund.").

Further, the requested 25% fee is less than the pre-litigation fee agreement between Lead Plaintiff and Lead Counsel, which authorized counsel to seek up to 33.3%. ¶188. While this Court need not adhere to that agreement, courts apply a presumption of reasonableness where a fee request is consistent with an *ex ante* agreement. *See In re Marsh & McLennan Cos. Sec. Litig.*, No. 04 Civ. 8144 (CM), 2009 WL 5178546, at *15 (S.D.N.Y. Dec. 23, 2009) ("Since the passage of the PSLRA, courts have found such an agreement between fully informed lead plaintiffs and their counsel to be presumptively reasonable.").[4] The *Goldberger* factors seek to identify "what fees common fund plaintiffs in an efficient market for legal services would agree to." 209 F.3d at 52. That the lead plaintiff, a sophisticated investor, negotiated an agreement to

---

[4] *See also In re Global Crossing*, 225 F.R.D. at 466 ("in class action cases under the PSLRA, courts presume fee requests submitted pursuant to a retainer agreement negotiated at arm's length between lead plaintiff and lead counsel are reasonable"); *Converse*, 2010 WL 2653354, at *4; *In re China Sunergy Sec. Litig.*, No. 07 Civ. 7895 (DAB), 2011 WL 1899715, at *6 (S.D.N.Y. 2011); *In re Cendant Corp. Litig.*, 264 F.3d 201, 282 (3d Cir. 2001).

pay a 33.3% fee is relevant to that inquiry and supports the reasonableness of Lead Counsel's request for a 25% fee in this case. *See Global Crossing*, 225 F.R.D. at 466; *Comverse*, 2010 WL 2653354, at *4.

### 2. *The Risks of This Litigation Support the Requested Fee*

The requested fee is also reasonable because Plaintiffs' Counsel obtained this result in the face of substantial risks. Indeed, "the risk of success [is] 'perhaps the foremost' factor to be considered" in determining a reasonable fee. *Goldberger*, 209 F.3d at 54. "No one expects a lawyer whose compensation is contingent upon his success to charge, when successful, as little as he would charge a client who in advance had agreed to pay for his services, regardless of success." *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 470 (2d Cir. 1974). In applying this factor, "'litigation risk must be measured as of when the case is filed,' rather than with the hindsight benefit of subsequent events." *Global Crossing*, 225 F.R.D. at 467 (quoting *Goldberger*, 209 F.3d at 55). The many risks that Plaintiffs' Counsel faced in prosecuting this suit justify the requested 25% fee.

Numerous courts have recognized that "class actions confront even more substantial risks than other forms of litigation." *Comverse*, 2010 WL 2653354, at *5. Securities class actions in particular are "notably difficult and notoriously uncertain." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, No. 02-CV-3400 (CM), 2010 WL 4537550, at *27 (S.D.N.Y. Nov. 8, 2010). This case was no exception. From the outset, Plaintiffs' Counsel undertook a complex, expensive, and likely lengthy litigation with no guarantee of compensation. With an average lag time of several years for a case like this to conclude, the financial burdens on Plaintiffs' Counsel were greater than those for a firm paid on an ongoing basis. *See Flag Telecom*, 2010 WL 4537550, at *27.

Plaintiffs' Counsel received no compensation for more than four years of litigation and advanced nearly $4 million in expenses that might never have been recovered.

The Court finds that the contingency risk in this case supports the requested award. The Court further finds that the additional risks of establishing liability and proving damages (discussed *supra*), further support the granting of the application for fees.

***3. The Magnitude and Complexity of the Litigation Support the Fee***

The "magnitude and complexities of the litigation" confirm the reasonableness of the fee. *Goldberger*, 209 F.3d at 50.

As explained above, this case raised a number of complex questions concerning liability and damages. The complexities were especially acute given the case's international dimension, involving foreign defendants, foreign witnesses, and foreign-language documents and deposition testimony, in a dispute that turned in large part on foreign legal standards and the significance of actions by foreign regulators.

The magnitude of this action was similarly unquestionable. Plaintiffs' claims arose out of Alibaba's historic $25 billion IPO with well over $1 billion of damages on the line. The magnitude and complexity of the litigation support the requested fee.

***4. The Quality of Representation Supports the Requested Fee***

One marker of the quality of representation the Class received is the quality of the result obtained. *See, e.g.*, *Global Crossing*, 225 F.R.D. at 467 ("The quality of Securities Lead Counsel's representation is evidenced by the recovery obtained for the Securities Class . . . ."). The $250 million Settlement – the largest ever against a Chinese company – is a significant amount, and represents approximately 17%-20% of the Class's estimated maximum recoverable damages. The

quality of representation by both Plaintiffs' and Defendants' counsel was high in this case and supports the requested fee.

### *5. Important Public Policies Support the Requested Fee*

Private securities litigators may serve a function as private attorneys general and are a "necessary supplement to [SEC] action." *Bateman Eichler, Hill Richards, Inc. v. Berner,* 472 U.S. 299, 310 (1985). "[The Supreme] Court has long recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions brought, respectively, by the Department of Justice and the Securities and Exchange Commission." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007). In recognition of this important function, courts have adopted the "commendable sentiment in favor of providing lawyers with sufficient incentive to bring common fund cases that serve the public interest." *Goldberger,* 209 F.3d at 51. The public policies underlying that federal regime are compelling in this case.

### *6. The Time and Labor Expended by Counsel – As Demonstrated by the Lodestar Cross-Check – Supports the Requested Fee*

The "time and labor expended by counsel" confirms the reasonableness of the fee. *Goldberger*, 209 F.3d at 50. Plaintiffs' Counsel have represented that they collectively devoted a total of over 56,600 hours to the prosecution of this action since its inception four years ago. As noted above, those hours include the review of more than one million pages of documents, navigating a successful appeal, conducting intensive fact discovery in the United States and China, and extensive settlement negotiations nearing the summary judgment phase. These efforts and the size of the settlement fund supports the Court's finding that this *Goldberger* factor

supports the award of a 25% fee.

### *7. The Objection to the Award of Attorneys' Fees is Meritless*

The objection asserts that Lead Counsel's request for a 25% attorneys' fee is based on a "benchmark" theory and would thus result in an improper windfall. They are flatly wrong. The 25% fee was deemed reasonable upon "scrutiny of the unique circumstances of [this] case." *Goldberger*, 209 F.3d at 53.

In addition, the 25% fee is reasonable considering the lodestar cross-check. In this case, the 25% corresponds to a lodestar multiplier of approximately 2.15, well within the range commonly awarded in securities class actions of this complexity and magnitude. *See Wal-Mart*, 396 F.3d at 123 n.27 (upholding multiplier of 3.5 on lodestar of $62.9 million in antitrust class action); *In re Credit Default Swaps Antitrust Litig.*, No. 13 md 2476 (DLC), 2016 WL 2731524, at *17 (S.D.N.Y. Apr. 26, 2016) (Cote, J.) (approving $253.8 million fee based on multiplier of "just over 6" in a case that settled before class certification and based on lodestar generated from 2016 partner rates of $834 to $1,125 and associate rates of $411 to $714); *Woburn Ret. Sys. v. Salix Pharm., Ltd.*, No. 14 Civ. 8925 (KMW), 2017 WL 3579892, at *6 (S.D.N.Y. 2017) (Wood, J.) ("Although a lodestar multiplier of 3.14 for a settlement of $210 million is high, it is still within the range of lodestar multipliers approved in this Circuit."); *In re Deutsche Telekom AG Sec. Litig.*, No. 00 Civ. 9475 (NRB), 2005 WL 7984326, at *4 (S.D.N.Y. June 9, 2005) (Buchwald, J.) (approving multiplier of 3.96 for settlement of $120 million); *see also EVCI*, 2007 WL 2230177, at *1, *17 (2.48 multiplier "is within the range found to be reasonable" despite settlement of only $7.7 million).

As noted above, the Court is satisfied that the fee is reasonable in light of the *Goldberger*

factors and the fees deemed reasonable by other courts in this district in similarly sized settlements.

## VII. REASONABLE EXPENSES

In addition to approving the proposed 25% fee, the Court approves reimbursement of counsel's out-of-pocket expenses from the Settlement Fund. "It is well accepted that counsel who create a common fund are entitled to the reimbursement of expenses that they advanced to a class." *Flag Telecom*, 2010 WL 4537550, at *30. Class counsel should be reimbursed "for reasonable out-of-pocket expenses incurred and customarily charged to their clients, as long as they were 'incidental and necessary to the representation.'" *China Sunergy*, 2011 WL 1899715, at *6.

Plaintiffs' Counsel have represented that they collectively incurred $3,937,803.35 in out-of-pocket litigation costs in the prosecution of this action. The vast majority of those expenses were incurred for services rendered by Plaintiffs' seven experts: $2,126,911.57 (54.0%); followed by document translation and oral deposition interpretation: $877,748.10 (22.3%); travel, including air and ground transportation, hotels, and meals: $460,090.11 (11.7%); deposition reporting: $186,865.03 (4.7%); and electronic discovery fees: $151,283.05 (3.8%). *Id.* The remaining expenses are for costs such as copying, service of process, filing fees, and other incidental expenses.

The total expenses are roughly 1.6% of the Settlement Amount, which is consistent with the expense ratios for other settlements of this size – and reasonable here where counsel traveled abroad for nearly all of the depositions and required extensive document translation and oral interpretation services. *See* Theodore Eisenberg, Geoffrey Miller & Roy Germano, *Attorneys'*

*Fees in Class Actions: 2009-2013*, 92 N.Y.U. L. Rev. 937, 963 (2017) (median expenses of 1.71%).

Finally, the request is below the $5 million limit disclosed in the Notice, and no Class Member has objected to the request. In sum, the request for reimbursement of expenses in the total amount of $3,937,803.35 is reasonable and will be granted.

## VIII. PLAINTIFFS' EXPENSES

Finally, Plaintiffs' counsel has applied for awards to lead Plaintiffs. The PSLRA allows for reimbursements to representative plaintiffs in securities class actions, providing: "Nothing in this paragraph shall be construed to limit the award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of the class."15 U.S.C. § 77z–1(a)(4). "Courts in this Circuit routinely award such costs and expenses both to reimburse the named plaintiffs for expenses incurred through their involvement with the action and lost wages, as well as to provide an incentive for such plaintiffs to remain involved in the litigation and to incur such expenses in the first place." *Hicks v. Morgan Stanley*, 2005 WL 2757792, at *10, 2005 U.S. Dist. LEXIS 24890, at *30 (S.D.N.Y. Oct. 24, 2005); see also *In re WorldCom, Inc. ERISA Litig.*, 2004 WL 2338151, 2004 U.S. Dist. LEXIS 20671 (S.D.N.Y. Oct. 18, 2004) (awarding $ 5,000 to each of the three named plaintiffs involved in the litigation and had "performed an important service to the class"). Here, the Court finds that the lead plaintiffs devoted substantial time and effort to prosecuting this action, including preparing for and being deposed by Defendants, reviewing pleadings and briefs, assisting with discovery responses, collecting documents for production, and evaluating and approving the settlement. Plaintiffs' requests for an award is reasonable.

## CONCLUSION

The Clerk of the Court is directed to mark the settlement approved, to remove the motions at Docket Nos. 127 and 129 from the Court's list of open motions, and to close the file.

Dated: October 16, 2019

Chief Judge

BY ECF TO ALL COUNSEL